Thank you, Your Honor. May it please the Court? Counsel. Daniel Gertz for Mr. Rodriguez. This is a drug case. Mr. Rodriguez was abducted in Mexico, brought to the United States, and participated in this crime in Minnesota. The question for the Court is whether Judge Frank should be re-erred by not permitting the coercion defense to be considered by the jury. This Court has had several cases of this nature that... Judge Frank Rodriguez Well, you know, I think you just overstated the record there. The Court didn't prevent it from being precluded. And, in fact, both it was argued clearly all the way through the case, the government's closing argument led off trying to refute what the anticipated argument, and the argument wasn't made. So whatever, what the Court clearly allowed was the typical litigation, you know, fight it out and then argue it, and the jury decides that that wasn't pursued here by the defense. And it seems to me that's highly relevant to the argument. I disagree, Your Honor. The instructions given by the Court made the argument patently useless and would have... Well, there was no objection to it. Jack, was there? Instructions? Yes, Your Honor. The objection was that we should have been given a coercion defense instruction and permitted the jury to consider the coercion defense. The jury was not permitted to consider it. Not permitted? Or it wasn't instructed that it was a... There's a huge difference between you can't do that and I'm not going to instruct it. Well, the jury was instructed in such a way that coercion was not a defense. You could have argued coercion all you wanted, but the instructions did not permit the jury... You didn't put the instructions in your briefer addendum, so I haven't read them. I'm going to have to read them because I doubt that they were as negative as you described them. Otherwise, the government wouldn't have focused at the opening of its closing argument to refute the defense that was coming but never came. Well, the prosecution was refuting the testimony of the defendant. The defendant who explained... Which was the basis for... Going to be the basis, right? Should have been the basis for giving the jury an instruction on the coercion defense. I assume the instructions are in the record on appeal. It would have been helpful if you attached them. I assume the instructions are part of the transcript and I can't point to... We don't read the transcript for oral argument. At least I don't. I can assure you a duress defense was not... That instruction was not given, and that's why we're here, in fact. Well, I know the instruction wasn't given, but you're describing your interpretation of how the jury had to interpret what was given, and that's what I'm questioning. Okay, fair enough. They're in the record. The instructions are that the elements are the usual elements that you find in a drug case, that we have contraband, and that you participated in the crime, and this was not at issue. The defendant took the stand, Mr. Borrega said, yes, I did participate in this, and I did it, and here's why I did it. So the jury had all that before it. What the jury was not permitted to consider was the legal defense of coercion. Is this one of these cases and defenses where sometimes when they give you a mens rea instruction, the mens rea instruction reasonably incorporates the defense. I don't know that duress is one of them. Duress is more of an excuse than a justification, I think, but it's been a few years since I've taught criminal law. Is there an argument that the existing instructions because of the mens rea could have incorporated the duress defense, or do you disagree with that? I disagree with that because with the duress defense, the government has to prove that in fact there was no duress, or duress was not the cause of his committing the crime. In this case, contrary to a lot of the other cases, some of the distinguishing features are that Mr. Borrega's wife and family had in fact been surveilled by his abductors in Mexico. Wait a second. I want to just go back. This is not an affirmative defense for the defense to prove. This is something for the prosecution to disprove beyond a reasonable doubt. Is that what you're saying in terms of how it's proven at trial? It's an affirmative defense that the defense has to prove by a preponderance, but then once it does that, it shifts to the government to disprove it.  And what the district court here found is that the defense had not carried the burden of preponderance of showing elements one and three, the immediacy of the threat, and the not having an alternative other than committing the crime. Well, let me ask you, so that was my understanding too. I got confused by one of your answers. But on the third element, no reasonable legal alternative. Here you have the defendant actually testifying that he might have been able to get away, and he probably could have called the police to report what was going on, and even said, and this is a quote, he could escape the situation without his family being killed. And I just wonder whether that suggests that there was a reasonable legal alternative. This is one of those cases where they were literally holding a gun to his head, but he saw some ways to get out by his own testimony and didn't take them. It might be dangerous, but he didn't take them. I disagree with what you just said. He said, quote, it came to mind to flee, but at the same time, I knew that my whole family was going to lose their life. He knew he could not flee without his family being killed. That was what he testified to. He also knew that the commodity, the merchandise, nothing could happen to it, otherwise they were going to kill me and my family. So he couldn't go to the police and tell them about this. Of course, the family threat, as far as I can tell from the briefs, the only family threat came months before in another country. He was required to report daily to his oppressor, and it was a constant daily reminder that his family had a gun to their head. What's the connection between the threats and his conduct of the offense, the actual controlled buys, as opposed to other things that they may have been manipulating or urging him to do? Well, his responsibility was to stay at the house and do what he was told, and that included making sure nobody took the merchandise, stole it, making sure that when somebody came to get it, he handed it off. It was all part of the package. If he had left, had not chosen to do that, then the consequences were to happen. But what was he actually convicted of? He was convicted of, if I recall, both a conspiracy, but I think there were substantive counts as well on the controlled buys. And I'm sorry, I don't remember how many counts there were. Distributing meth is what I've got in my notes. There were, I think, a couple counts of those, and then I think there was a conspiracy count. Well, what did they convict of? Everything.  Everything he was charged with. I'd love to talk more. I'd like to save a little bit for rebuttal. Thank you. Mr. Nelson again. Thank you, Your Honor, and again, may it please the Court. The defendant was convicted of four crimes. There were three distribution of methamphetamine counts and one possession with intent to distribute methamphetamine count based on a search warrant on October 12th. Not conspiracy? There was no conspiracy count, Your Honor. The District Court did not err in refusing to give a duress instruction in this case because the defendant failed to present sufficient evidence for a jury to find in his favor on all the elements of that defense. And there's really two elements I want to focus on, which is element one and three. Element one requires a present, imminent, and impending threat of such a nature as to induce a well-grounded fear of death or serious injury. And this Court has said we need more than a generalized or speculative fear. There needs to be a specific threat of immediate harm. And here, that's where the defendant failed to present sufficient evidence. There's a couple of factors I want to talk about. First is the timing. The alleged threat happened about two to three months, at least two to three months before the criminal conduct that was charged. It's undisputed that the defendant was at this house in Minnesota by at least July 14th of 2022. And the threat was made to him at some unspecified time in Mexico before coming to Minnesota. And by his own timeline, that would have been at least a week before he came to Minnesota. So we're talking about a threat made in... I thought it was pretty clearly more. It took him a week to get across the border. And then they had to wander all the way up to, was it Minnesota? Your honor is correct. The precise timing isn't spelled out, but it would have had to have been at least a week by his own testimony. And the defendant testified that that threat was repeated maybe one time over the phone, this is at transcript page 404, when the box of meth arrived at the house. So we have a threat made in Mexico, repeated maybe one time in early July over the phone as well. Does the threat, though, have to be repeated like every week or every day? I mean, at some point you're like, okay, they're going to kill my family. I get it. It's reasonable to think that when those threats happen that they last for a little while. I don't disagree with your honor. I think just under the facts of this case, as I'm going to explain here, that's not the situation here. Because at most you have a threat made early July. The criminal conduct didn't occur until September and October, mid-September and mid-October, so two to three months later. And that kind of significant temporal gap alone is sufficient for the district court to find that it was not immediate or impending. Both the Morales and the Harper cases hold that threats made on a prior separate occasion from the criminal conduct are not alone sufficient. And I think that's even more so the case here where multiple months have passed from the threat to the criminal conduct. The circumstances of the threat also show it's not immediate or impending. The threat was made by essentially an unknown man in Mexico, in a city called Morelia. In terms of geographic distance, that man is 2,000 miles away from the defendant in Minnesota, and he lives in the city four hours away from the defendant's family. The threat was very general. The way it was described was you have to do whatever I tell you, quote, otherwise your family can be killed. And at the time the threat was made, the defendant claimed he was a bound captive of that unknown man. But with respect to the defendant's family, the only testimony was that this unknown man claimed to have gotten the defendant's information off of his cell phone and made an unverified claim that he had spoken to the defendant's wife and she was fine. Supposing it said, I know where you live, you're at such-and-such address and I'm going to come get them if you deviate from this plan. I think that would weigh more in favor of the giving of duress instruction than you have here. Whether that alone would be sufficient, I don't know. I think it's very fact intensive. But, yes, some degree of specificity would add to the need for a duress instruction or make it more likely that this is a specific immediate threat. There's also no evidence that this unknown man had any sort of access to the defendant's family, had them in captivity, or had them under surveillance. Again, the only reference is to this one, that the unknown man had spoken to the defendant's wife. The other thing is there is a lot of intervening circumstances between this threat and the criminal conduct. After the threat is made, the defendant leaves the unknown man's captivity according to his own account. He's never in that man's presence again. There's no evidence he is ever again in the presence of anyone who makes a threat to him or uses force. There's no evidence of firearms appearing again or being threatened with firearms again. And there's no evidence of ongoing surveillance, monitoring, or access to the defendant's family. There's no evidence of the defendant or his family ever being abound or captive again like the defendant claims he was. And as those three months pass, the defendant is regularly outside the presence of anyone involved in this criminal scheme. He admits he was away from his unnamed accomplices of this man when he twice crossed the border into the United States. He was in official U.S. custody by his own account when he was arrested by immigration authorities following his first crossing. And then even after he arrives in Minnesota and he's living with these two men, the Zendejas, father and son duo, he admits that they would, quote, come and go from Mexico. And he was alone for the three controlled buys. No one else was with him. And he was the sole person in the house where the methamphetamine was found, where the deals took place for extended periods of time, by his own admission as much as 15 to 20 days at a time, during which he has access to a vehicle. He has access to a cell phone. So all those intervening circumstances, I think, weigh in favor of the District Court finding there was simply not sufficient evidence of an immediate impending threat. It was also contradicted by other evidence. On the controlled buy videos, the defendant is seen laughing, smiling, offering the informant a beer. But more importantly, the defendant claimed he was told by these Zendejas, father and son, that he had to take responsibility for the drugs when he was  But it's undisputed that he didn't do that. And that strongly contradicts his claim that he was, he believed his family would be killed if he didn't follow the instructions of these people. The other element I want to focus on is element number three, which says that the defendant has to have no reasonable legal alternative to violating the law. And here there's no dispute, I don't think, that the defendant himself had the ability to flee or go to the police, for the reasons I just mentioned. He's unsupervised for extended periods. He has a car. He has a cell phone. He himself admitted he could leave or call the police. His claim is that he was restricted by fear for his family. But again, with respect to the family, there's no evidence that the family was unable to leave, flee, go to the police. Again, the family, there's no indication that the family was under this unknown man's power in any way. Can I ask, though, I had asked opposing counsel about this. There is that statement on page 405, which I think came during cross-examination, where he talked about the fact that he could, he thought he could escape the situation without his family being killed. Does the government rely on that? And what do you make of that statement? I think there was a first question of, like, was there a time when you thought you could escape without your family being killed? The defendant answers yes. Was there a time when you thought you could leave? The defendant says, well, it came to mind to flee, but at the same time I knew my whole family was going to lose their life. So the way I interpret that is the defendant saying, I can get away. But my concern is that if I get away, my family's going to be killed. But that is where the evidence fails. There's no evidence the family could not get away themselves. Did the district court make any credibility findings in considering this issue with respect to the, when the issue was, do I give the instruction? Absolutely not, Your Honor. The district court is very explicit. I am not making any credibility findings. I am denying the instruction solely on the basis of the sufficiency of the evidence. The last point I'll make is that, really, I think what the defendant's testimony boils down to is that, at most, he had a subjective belief that going to police was going to be futile, that his family fleeing was going to be futile. And this court has held, again, both in, well, in the Miles case, I think in Harper as well, there needs to be some evidence in the record establishing a breakdown in the law enforcement system that might justify declining to make a report. A subjective belief alone is not sufficient to meet the third element of the test. And because the evidence was insufficient on both elements one and element three of the duress defense, district court did not err in any way in refusing to give a duress or coercion instruction. Thank you. Unless there's any questions, I yield the remainder of my time. Thank you. Thank you, Your Honor. To address specific points, first of all, this person was not unknown. Mr. Rodriguez was bound in his basement for four or five days and spoke directly to him. I can't tell you what his name is, but that doesn't mean he's unknown. Regarding the contact with the family, both he had explained to him that they knew where his family was, who they were, identified them and his wife thereafter when he was in Minnesota spoke to him and said, please do what he says. They've contacted us. She was just as worried. What about the argument, and I think it's interesting, that the family could have just moved. I know it's a hardship, but the family could have essentially absconded away for at least a little while so that he could have escaped. That is rank speculation. I doubt that's true. I don't know. There's certainly no evidence of it one way or the other. I agree. But our discussion about, well, this was a subjective speculation. If we live in a fairytale world, yes. The violence is real, and it's every day. So when Mr. Rorikus takes it seriously, when his family takes it seriously, they're not speculating. It's real. If we want to just get rid of the coercion defense, we can do that. But there has to be a case where in the real world we acknowledge that people are legitimately fearful for reasons that are based on real life. That's what we have in this case. He could not have disobeyed his captors. He had to be in contact with them every day. They knew where his family was. They had a gun to his family's head. Thank you.